870 F.2d 655
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Judy B. RUHLAND, Executor of the Estate of Edmund E.
Ruhland, Jr., deceased, Plaintiff-Appellant,
v.
COPPERSTONE CENTER MEDICAL ASSOCIATES, William F. Cale,
Terry L. Overby, M.D., Defendants-Appellees.
 No. 87-2219.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 31, 1988.
Decided March 1, 1989.
 
 1
 William D. Cremins for appellant.
 
 
 2
 Ronald D. Hodges (Phillip C. Stone, Roy W. Ferguson, Jr., Wharton, Aldhizer & Weaver on brief) for appellees.
 
 
 3
 Before K.K. HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and TERRENCE WILLIAM BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 
 TERRENCE WILLIAM BOYLE, District Judge:
 
 4
 Judy B. Ruhland appeals from the entry of judgment on a jury verdict in favor of all defendants in this medical malpractice action for the alleged wrongful death of her husband. Mrs. Ruhland contends the district court erroneously found the defendants' testimony corroborated as a matter of law under Virginia's "dead man" statute. She also maintains the trial court erred in instructing the jury on the applicable standard of care and in allowing a pathologist to render an expert opinion in the field of clinical cardiology. Since we find none of these contentions support reversal of the jury's verdict, we affirm.
 
 I.
 
 5
 At the time of his death in June 1983, the decedent Edmund D. Ruhland, Jr., had been seeing Dr. Terry Overby for treatment of a kidney disorder at Copperstone Clinic in Harrisonburg, Virginia, for two and one-half years. At a May 1983 checkup, Mr. Ruhland reported having shortness of breath, and Dr. Overby detected wheezing in the upper chest. Dr. Overby consulted with an associate, Dr. William Cale, and they jointly decided that Mr. Ruhland should undergo a pulmonary stress test in order to diagnose his respiratory problem.
 
 
 6
 The stress test, involving monitored exercise on a treadmill, was performed June 22, 1983 at Copperstone Clinic. Almost four minutes into the exercise portion of the test, Mr. Ruhland complained of some vague discomfort, and forty-five seconds later he had some right arm discomfort. After almost seven minutes he reported that his legs were giving out, and the treadmill exercise was stopped. After reclining for four minutes in accordance with the test procedure, Mr. Ruhland walked over to the pulmonary function study machine to breathe into it. At that point Mr. Ruhland went into cardiac arrest. He eventually died despite efforts at resuscitation.
 
 
 7
 Judy B. Ruhland, as executor of her husband's estate, brought this diversity action for wrongful death in the Western District of Virginia against Dr. Overby, Dr. Cale, and Copperstone Center Medical Associates, a Virginia partnership which was the sole owner and operator of Copperstone Clinic and of which Dr. Overby was a partner and Dr. Cale an employee. A jury trial ended with a verdict in favor of the defendants.
 
 II.
 
 8
 Plaintiff appeals the district court's ruling that defendants' testimony was adequately corroborated as a matter of law under Virginia's dead-man statute. We find that sufficient corroborating evidence supported the district court's determination.
 
 A.
 
 9
 Virginia's "dead man" statute, Va.Code Sec. 8.01-397, provides that no judgment shall be rendered against a person incapable of testifying, or his representative, if it is founded upon the uncorroborated testimony of an adverse or interested party.[1] The statute's purpose is to prevent the surviving party from having the benefit of his own testimony where, by reason of his adversary's death, the personal representative has been deprived of the decedent's version of the facts. Hereford v. Paytes, 226 Va. 604, 311 S.E.2d 790 (1984). The controlling principles were summarized in Brooks v. Worthington, 206 Va. 352, 357, 143 S.E.2d 841 (1965):
 
 
 10
 'Corroborating evidence is such evidence as tends to confirm and strengthen the testimony of the witness sought to be corroborated--that is, such as tends to show the truth, or the probability of its truth.' ... Such evidence need not emanate from other witnesses but may be furnished by surrounding circumstances adequately established.... Nor is it essential that an adverse or interested party's testimony be corroborated on all material points....
 
 
 11
 At the close of all the evidence, plaintiff moved to strike the defendants' testimony for lack of corroboration under Va.Code Sec. 8.01-397. The district court denied the motion, and the next day plaintiff tendered jury instructions pertaining to corroboration. The district court declined to instruct the jury on this issue, finding that the defendants' testimony had been corroborated as a matter of law.
 
 B.
 
 12
 Plaintiff questions the district court's authority to withdraw the corroboration issue from the jury's consideration. It is true that the question of whether there is sufficient corroborating evidence under Va.Code Sec. 8.01-397 is usually for the jury to decide. Whitmer v. Marcum, 214 Va. 64, 68, 196 S.E.2d 907 (1973). However, "corroboration need not always present a jury issue; a trial judge is not precluded from a determination that the witness's testimony has been corroborated as a matter of law, and 'questions of law are never for the jury.' " Id. The district court thus had the authority to decide the corroboration issue as a matter of law.
 
 C.
 
 13
 The district court found that the defendants' testimony about Mr. Ruhland's physical condition and what he said to them was sufficiently corroborated as a matter of law by contemporaneous medical records and the testimony of two nurses employed at Copperstone Clinic. Plaintiff contends this finding was not supported by the evidence, at least with respect to particular portions of the defendants' testimony.
 
 
 14
 With respect to Dr. Overby, plaintiff questions the sufficiency of corroboration for his testimony about a conversation he and Dr. Cale had with Mr. Ruhland prior to the stress test in which they allegedly went over the risks and benefits of the procedure and received Mr. Ruhland's firm consent.[2] This evidence was corroborated by the consent form which Mr. Ruhland signed[3] and by the testimony of Brenda Hoover, a nurse at Copperstone Clinic. Nurse Hoover stated that she went through the consent form with Mr. Ruhland before he signed it, explaining the stress test procedure and informing him of the risks involved, including the risk of heart attack and death.
 
 
 15
 With respect to Dr. Cale, plaintiff questions the sufficiency of corroboration for the following testimony about Mr. Ruhland's physical condition immediately after the treadmill exercise:
 
 
 16
 A. He was perfectly--he appeared perfectly comfortable. He got up off the table. He walked over--I mean he got, he walked off the stress testing machine. He walked over to the table. He laid down on the table without any distress at all. His respiration pattern was not labored. His lungs were clear. His heart sounds were no different than the gallop that was mentioned previously and was seen previously by Dr. Overby. He got up off the table after his blood pressure was taken and the arterial blood-gases were drawn. He walked over to the, to the pulmonary functions testing equipment and sat down without any problems, with no complaints ...
 
 
 17
 Q. What about his color?
 
 
 18
 A. Color was normal. He didn't have any, any pallor or paleness about the face. He did not have any cyanosis or blueness about the face or the nailbeds. He appeared to have perfectly good circulation, just to look at him. You know, there wasn't anything that indicated any distress. There wasn't any clue of any problem going on.
 
 
 19
 Q. Did he complain of anything after he got off the treadmill and was going through those things?
 
 
 20
 A. Not at all, no complaints.
 
 
 21
 This evidence was corroborated by contemporaneous medical records and by the testimony of Pamela Cox, another nurse at Copperstone Clinic. The medical records show that Mr. Ruhland's heart rate and blood pressure subsided toward their pre-test resting levels in the first three minutes following his exercise on the treadmill. Nurse Cox testified that "as far as his vital signs went, they progressed according to what I have seen on other stress tests. His pulse rate was slowing down." She also stated that he was not perspiring, complaining, rubbing his chest, or appearing to be uncomfortable.
 
 
 22
 The only point on which Dr. Cale's testimony was not corroborated by Nurse Cox was his statement that Mr. Ruhland's respiration pattern was "not labored." Nurse Cox testified that "[h]e seemed short of breath." It is not essential, however, that an adverse party's testimony be corroborated on all material points. Brooks v. Worthington, 206 Va. 352, 357, 143 S.E.2d 841 (1965). We find there was sufficient corroborating evidence of both Dr. Overby's and Dr. Cale's testimony in the form of contemporaneous medical records, the consent form, and the nurses' statements to support the district court's finding that the doctors' testimony was corroborated as a matter of law.[4]
 
 D.
 
 23
 Plaintiff contends that the nurses' testimony cannot be used to corroborate the defendants' testimony, since by virtue of their employment with the defendants the nurses are "interested" parties within the meaning of the dead-man statute, which requires corroboration for the testimony of an "adverse or interested party." She thus argues that the testimony of the nurses themselves also requires corroboration.
 
 
 24
 An "interested party" has been defined as "one who has a pecuniary interest in the recovery, although not a party to the record." Atlantic Coast Realty Co. v. Robertson's Ex'r., 135 Va. 247, 116 S.E. 476, 480 (1923). Neither of the nurses had a pecuniary interest in the outcome of this case. Pamela Cox was no longer employed by Copperstone Clinic at the time she testified at trial. And Brenda Hoover, while still employed there, did not for that reason have a pecuniary interest in the case. See Reddy v. Mody, 39 Md.App. 675, 388 A.2d 555 (1978); May v. Triple C Convalescent Centers, 19 Wash.App. 794, 578 P.2d 541 (1978); Carson v. Beloit, 32 Wis.2d 282, 145 N.W.2d 112 (1966). Since the two nurses were not "interested" parties, their testimony did not require corroboration and could be used to corroborate the testimony of the doctors.
 
 II.
 
 25
 Plaintiff also objects to the district court's jury instruction that the standard of care was that of "a reasonably prudent doctor in the same field of practice in this Commonwealth." This language was based on Va.Code Sec. 8.01-581.20, which provides that in medical malpractice actions against physicians
 
 
 26
 the standard of care ... shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth.
 
 
 27
 The defendants objected to the district court's instruction at trial on the ground that it did not include the statutory words "or specialty" immediately after "field of practice." Plaintiff's counsel responded to this objection by saying, "Well, I think we're going to have to define what the specialty was, because I'd like an instruction, then, that they were practicing cardiology." Since the district court declined to add the words "or specialty" to the instruction as requested by the defendants, it also declined to give the additional clarifying instruction requested by plaintiff.
 
 
 28
 Plaintiff nevertheless contends it was error to deny the requested clarifying instruction. She argues that the instruction as given left unclear the applicable standard of care, since the defendant doctors were not cardiologists (Dr. Overby is a nephrologist; Dr. Cale is a pulmonary specialist), but their "decision-making process to begin the [stress] test and continue it amounted to the practice of cardiology."
 
 
 29
 It is unnecessary for us to consider the merits of this argument. Because plaintiff did not object to the standard of care instruction actually given, but only to the defendants' supplementary request which the district court denied, she is barred from assigning the instruction as error on appeal. See Fed.R.Civ.P. 51. Furthermore, even if this assignment of error had been properly made, it would not support reversal. "[A]n error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir.1983). Here plaintiff was clearly not prejudiced by the district court's failure to specify the applicable "field of practice," since the general term "practice" permitted plaintiff to argue to the jury that the defendants were practicing cardiology.
 
 III.
 
 30
 Finally, plaintiff contends the district court erred in permitting Dr. Wallace Holthaus, the pathologist who performed the autopsy, to answer the following question by defense counsel:
 
 
 31
 From your evaluation and examination in the conduct of the autopsy on that date of Mr. Ruhland's death, did you find any indication that Mr. Ruhland was not an appropriate person to put on the treadmill?
 
 
 32
 Following an objection by plaintiff's counsel, the district judge excused the jury and interrogated Dr. Holthaus out of their presence as follows:
 
 
 33
 [Y]ou are testifying, Doctor, as an expert in pathology, I take it, and the court, absent a motion, will accept you as an expert in pathology.
 
 
 34
 Now, as an expert in pathology, I'm going to ask you to listen carefully to Mr. Hodges' repeat of that question, and then see if you can answer it as an expert in pathology, not as an expert on whether you do or do not place this patient on the treadmill, but as a pathologist. Now, if you can answer it as a pathologist, fine; if you cannot, you can just say so.
 
 
 35
 All right, repeat the question, Mr. Hodges.
 
 
 36
 MR. HODGES: I'll try to be faithful to the original.
 
 
 37
 THE COURT: All right, I'll have the reporter read it.
 
 
 38
 NOTE: At this point, the court reporter read back pg. 54, 11. 44-50.
 
 
 39
 THE COURT: Now, did you hear the question?
 
 
 40
 THE WITNESS: Yes.
 
 
 41
 THE COURT: And you understand it?
 
 
 42
 THE WITNESS: Correct.
 
 
 43
 THE COURT: Now, as a pathologist, can you answer that question?
 
 
 44
 THE WITNESS: I feel that, based on what I found--
 
 
 45
 THE COURT: Whoa, whoa. Just, can you or can't you?
 
 
 46
 THE WITNESS: I think I can.
 
 
 47
 THE COURT: The answer's "yes"?
 
 
 48
 THE WITNESS: Yes.
 
 
 49
 THE COURT: All right, sir, then go ahead and answer it.
 
 
 50
 THE WITNESS: In my opinion, I found nothing that contraindicated a stress test.
 
 
 51
 THE COURT: Now, you make that opinion-statement as a pathologist?
 
 
 52
 THE WITNESS: Right.
 
 
 53
 THE COURT: From what you found in your pathological examination.
 
 
 54
 THE WITNESS. Right.
 
 
 55
 THE COURT: All right, I'm going to permit that question and that answer to be put to the jury, with the clear understanding that this is a pathology expert testifying and not an expert on whether he should or--Mr. Ruhland should or should not have had a stress test.
 
 
 56
 All right, bring back the jury, if you will.
 
 
 57
 Dr. Holthaus' answer was read back to the jury. The district judge then instructed the jury that the answer was given "by Dr. Holthaus as a pathologist from his pathological examination. It is not given by Dr. Holthaus as an expert on whether one should or should not have a stress test."
 
 
 58
 Plaintiff contends the question could only be answered by an expert in cardiology, whereas Dr. Holthaus was only qualified as a pathologist to answer questions about the post-mortem conditions in Mr. Ruhland's body. She argues that Dr. Holthaus was therefore incompetent to testify that those conditions were not a contradiction to stress testing.
 
 
 59
 The admissibility of expert testimony is "within the broad discretion of the trial judge and his action is to be sustained unless manifestly erroneous." Boleski v. American Export Lines, Inc., 385 F.2d 69, 71 (4th Cir.1967). The district judge's action here was not manifestly erroneous. He carefully ascertained out of the jury's presence whether the witness heard the question, whether he understood the question, whether he could answer the question as a pathologist, and what his answer was. After allowing the jury to hear the answer, the district judge specifically informed them that it was based on the witness's knowledge as a pathologist, not as an expert in stress-testing. We find the district judge acted within his broad discretion in admitting the challenged testimony.
 
 
 60
 Accordingly, the judgment of the district court is
 
 
 61
 AFFIRMED.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 At the time of trial, Va.Code Sec. 8.01.397 provided in part as follows:
 In an action by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; ...
 
 
 [2]
 The challenged testimony of Dr. Overby is as follows:
 Q. On June 22, 1983, while you were there with Mr. Ruhland beside that treadmill, did you go through this weighing the risks and the benefits of this particular test for him?
 A. Absolutely, absolutely. Not only did we go through it individually in our minds, Dr. Cale and I, but we went through it openly in front of Mr. Ruhland. I mean, we blatantly discussed, "Hey, we've got aortic stenosis right in front of him. Should we put him on the stress test?" Mr. Ruhland was absolutely adamant. He said, "Look, I've had that evaluated by Dr. Hallal. That's an old story. He told me I didn't have any kind of restrictions." That's what Mr. Ruhland said, that he didn't have any kind of problems; "that's an old story. I want to do this stress test. I want to go get out of here and go fishing." But he was very aware of what we were going through in our discussions.
 
 
 [3]
 The consent form reads as follows:
 COPPERSTONE CENTER MEDICAL ASSOCIATES CONSENT FOR CARDIOPULMONARY EXERCISE TOLERANCE TEST
 In order to evaluate my present cardiopulmonary health status and to determine an appropriate plan of treatment, I hereby consent to voluntarily engage in an exercise tolerance test. The test will be conducted by Dr. Cale. I understand that I will be questioned and examined by a physician, and have my electrocardiogram and pulmonary functions recorded. I also consent to the placement of an arterial catheter for the purpose of collection of blood samples prior to and following exercise.
 I will exercise by walking on a treadmill at varying speeds and grades for time intervals prescribed by the physician. During exercise, my electrocardiogram, blood pressure, heart rate, respiratory rate and expired air will be recorded. I will exercise until I reach an endpoint predetermined by the physician or until such symptoms as fatigue, shortness of breath, chest discomfort, or leg cramps occur which would indicate to me to stop.
 I understand that the risks of this testing procedure may include disorders of the heart rate and rhythm, abnormal blood pressure, fainting, breathing difficulties, and in rare instances, heart attack or cardiac arrest. Every effort will be made to minimize these risks by the preliminary examination and observations during testing. Emergency equipment and trained personnel are available to deal with emergencies should they arise. I understand the risks of arterial cannula placement to be disturbing the circulation to the hand in rare instances. Every effort will be made to minimize this risk by examining the circulation of the hand prior to the placement of the cannula.
 I acknowledge that I have read this form or it has been read to me, and I understand the cardiopulmonary exercise tolerance test in which I will engage. Any questions which have occurred to me have been answered to my satisfaction.
 
 
 [4]
 Since we find the evidence is sufficient to support the district court's ruling even under the higher degree of corroboration required in cases involving a confidential relationship, see Nicholson v. Shockey, 192 Va. 270, 64 S.E.2d 813 (1951), it is unnecessary for us to decide whether the higher standard is applicable here