Present:   All the Justices

IRENE M. DIEHL, ADMINISTRATRIX OF THE
ESTATE OF FRANCIS JOSEPH DUNLAP, SR., DECEASED

                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 971090              April 17, 1998

EDWARD B. BUTTS, M.D.

          FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                      Frederick B. Lowe, Judge

                                I.

     The primary issue that we consider in this appeal of a

judgment entered in a medical malpractice action is whether

Code § 8.01-397, commonly referred to as the dead man's

statute, barred the admission of the defendant's testimony.

                                II.

     Susan Gale Knight Dunlap filed this action as the wife

and guardian for Francis Joseph Dunlap, Sr., incompetent,

against Dr. Edward B. Butts, alleging that he breached the

standard of care owed to her husband.  At a jury trial, the

litigants adduced the following evidence which is relevant to

our disposition of this appeal.

     Mr. Dunlap fell from his bicycle and injured his head on

September 6, 1992.  The next day, he awoke with a headache, so

he decided to obtain a medical examination to make sure that

he did not have a concussion.  Mr. Dunlap went to a clinic

where he was examined by Dr. Stephen Menefee.  Mr. Dunlap

received a form, which the litigants described as a "head sheet," that enumerated certain symptoms and warnings associated with severe head injury, and he was instructed to contact a physician in the event he experienced any of these symptoms.  Dr. Menefee informed Mr. Dunlap that he had high blood pressure and advised him to seek treatment from his family physician.

Mr. Dunlap, who was still experiencing headaches, was evaluated by his family physician, Dr. Clarence A. Holland, on September 9, 1992.  Dr. Holland told Mr. Dunlap to continue to monitor himself for the symptoms and warning signs enumerated on the "head sheet."

Mr. Dunlap continued to experience headaches, so he went to see Dr. Holland again on September 11, 1992.  Dr. Holland noted in his medical records that Mr. Dunlap had complained of nausea and dizziness, and Dr. Holland ordered a computerized tomography (CT) scan of Mr. Dunlap's head.  Dr. Holland instructed Mr. Dunlap to go to a hospital where the CT scan would be performed and referred him to Dr. Butts, a neurosurgeon, who met Mr. Dunlap at the hospital.

After the CT scan was performed, Dr. Butts, Mr. Dunlap, and Mrs. Dunlap had a conversation in a waiting room.  Dr. Butts informed Mr. and Mrs. Dunlap that there was "a little bit of blood on the right side of [Mr. Dunlap's] brain but

2

that it would dissolve by itself."  Dr. Butts instructed the Dunlaps to watch for the symptoms that were enumerated on the "head sheet," such as dizziness and nausea, and if any of these symptoms occurred, they should contact him.

Dr. Andrej M. Ciric, a radiologist who later interpreted the CT scan and wrote a report of his findings, noted that a subdural hematoma was present on the right side of Mr. Dunlap's head and that he had suffered a cranial skeletal fracture.  A subdural hematoma, commonly described as a blood clot, occurs when blood collects between the covering and surface of the brain.  The accumulation of blood is caused by a tear of one of the veins on the surface of the brain.  Mr. Dunlap's subdural hematoma, which measured approximately 12 centimeters in length and one centimeter in thickness, was compressing his brain.  According to the plaintiff's evidence, Dr. Butts failed to inform Mr. Dunlap about the size of his subdural hematoma or his depressed skull fracture.

On September 12 and 13, 1992, Mr. Dunlap's nausea had stopped, but he continued to experience headaches.  Mr. Dunlap, who was employed as a marine engineer and had been working as a consultant for a project in New Orleans, Louisiana, had originally intended to leave his home in Virginia and return to New Orleans by September 9, 1992. However, he had postponed his planned departure date because

3

of his injuries.  According to the plaintiff's evidence, Mr. Dunlap did not intend to return to New Orleans until he had obtained permission from Dr. Butts to do so.

Dr. Butts treated Mr. Dunlap in an examination room on September 14, 1992.  No one was present during this examination other than Dr. Butts and Mr. Dunlap.  Dr. Butts was permitted to testify, over the plaintiff's objections, about his conversation with Mr. Dunlap when they were alone. Dr. Butts testified that he reviewed certain "warning signs" or symptoms which Mr. Dunlap should monitor and that these symptoms included nausea, dizziness, and slurring of speech. Dr. Butts said that he instructed Mr. Dunlap not to return to work in New Orleans and to come back for another evaluation in "a week-and-a-half."

Mrs. Dunlap, who had accompanied her husband to Dr. Butts' office on September 14, was in a waiting room during her husband's examination.  According to Mrs. Dunlap, after Dr. Butts had examined her husband, Mr. Dunlap informed her that Dr. Butts told Mr. Dunlap that he could return to New Orleans.  Mr. Dunlap informed his wife that Dr. Butts told Mr. Dunlap "to keep an eye out for such things as nauseousness, dizziness, and slurring, anything to that effect, and to come back and see him in two or three months."

4

Mr. Dunlap arrived in New Orleans on September 17, 1992, and he had a telephone conversation with his wife who was in Virginia. He informed her that he continued to experience headaches and that he did not feel well. On September 18, 1992, while at work, Mr. Dunlap informed a colleague that he had a "leaking blood vessel that gave him a spot [of blood] on his head," but that his doctor had given him permission to return to New Orleans. On September 20, 1992, after speaking with his wife by telephone, Mr. Dunlap decided to return to Virginia where he could be evaluated by Dr. Butts.

Mrs. Dunlap met her husband at the airport upon his return from New Orleans, and she called Dr. Holland from the airport to describe her husband's condition, which had deteriorated. Dr. Holland stated that Mr. Dunlap could exercise one of the following options: visit an emergency room; come to Dr. Holland's office in the morning where Holland would make arrangements for him to see Dr. Butts; or take medication Dr. Holland would prescribe. Dr. Holland informed the Dunlaps that it would be safe for Mr. Dunlap to wait until the next day before receiving medical treatment provided he did not have any other symptoms such as weakness on one side of his body, visual problems, or vomiting.

Mr. Dunlap decided to obtain the medication from a pharmacy, go home, and visit Dr. Holland the following

morning.  After he returned to his home, Mr. Dunlap took the medication and went directly to bed.  The next morning, Mrs. Dunlap was unable to awaken him.  She immediately called emergency response personnel, and Mr. Dunlap was taken to a hospital where he was diagnosed with cerebral herniation secondary to subacute subdural hematoma.  Mr. Dunlap's blood clot had bled, expanded massively, and compressed his brain. Mrs. Dunlap was informed that Mr. Dunlap had less than a five percent chance of survival of an operation to relieve the pressure on his brain.  After the operation, Mr. Dunlap remained in a coma for about two months and was ultimately placed in a health care facility for two years.

The plaintiff adduced expert testimony at trial that Dr. Butts breached the applicable standard of care owed to Mr. Dunlap and that this breach of the standard of care was a proximate cause of Mr. Dunlap's injuries.  Dr. Butts presented expert testimony that he complied with the applicable standard of care owed to Mr. Dunlap.  Some of Dr. Butts' expert witnesses' opinions, however, were predicated upon Dr. Butts' testimony that when he was alone with Mr. Dunlap, Dr. Butts gave certain oral instructions to Mr. Dunlap and that he warned Mr. Dunlap not to return to New Orleans.

At the conclusion of a lengthy trial, the jury returned the following verdict:  "We, the jury, find in favor of the

plaintiff and fix damages at: $0. ZERO DOLLARS." The trial court entered a judgment confirming the verdict, and the plaintiff appeals.[1]

### III.

### A.

Code § 8.01-397 states in part:

> "In an action by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony."

The plaintiff, relying upon this statute, argues that the trial court erred by holding, as a matter of law, that Dr. Butts' testimony, about his conversations with Mr. Dunlap when no one else was present, was corroborated. Continuing, the plaintiff argues that because of the existence of the physician/patient relationship, Dr. Butts was required to present evidence of a higher degree of corroboration than is required in most cases.

Initially, Dr. Butts argues that Code § 8.01-397 is not applicable in this proceeding because the jury ultimately returned a verdict in favor of the plaintiff and, thus, no

---

[1] Mr. Dunlap died after the final judgment order was entered, and Irene M. Diehl, administrator of his estate, was substituted as the plaintiff.

7

judgment was "rendered in favor of an adverse or interested party."  Dr. Butts' argument is without merit because, under his analysis, a trial court would be required to wait until after the jury rendered a verdict before determining whether a party's testimony must be corroborated.  Certainly, Code § 8.01-397 does not mandate this illogical procedure.

B.

We find no merit in Dr. Butts' contention that "[t]he Dead Man's Statute was designed as a 'shield' to protect the decedent or incompetent party from fraudulent claims which that party, due to his incapacity, could not refute; it should therefore not be used as a 'sword' to silence the defense of an otherwise competent party."  Code § 8.01-397 is designed to prevent a litigant from having the benefit of his own testimony when, because of death or incapacity, the personal representative of another litigant has been deprived of the testimony of the decedent or incapacitated person.  The statute substitutes a requirement that testimony be corroborated in place of the harsher common law rule which disqualified the surviving witness for interest.  Vaughan v. Shank, 248 Va. 224, 229, 445 S.E.2d 127, 130 (1994); Hereford v. Paytes, 226 Va. 604, 608, 311 S.E.2d 790, 792 (1984).[2]

_____

[2] We find no merit in Dr. Butts' summary argument that Code § 8.01-397 violates traditional notions of due process or

C.

Dr. Butts argues that even if Code § 8.01-397 is applicable here, any error that the trial court committed is harmless and that his testimony was corroborated as a matter of law. We disagree.

We observed in Whitmer v. Marcum, 214 Va. 64, 67, 196 S.E.2d 907, 909 (1973), that corroborating evidence "is such evidence as tends to confirm and strengthen the testimony of the witness sought to be corroborated — that is, such as tends to show the truth, or the probability of its truth." Additionally, in Vaughan, 248 Va. at 229, 445 S.E.2d at 130, we stated the following principles which are equally pertinent here:

> "To be deemed sufficient under Code § 8.01-397, the corroboration 'must at least tend, "in some degree, of its own strength and independently, to support some essential allegation or issue raised by the pleadings [and] testified to by the [surviving] witness . . . which allegation or issue, if unsupported, would be fatal to the case."' Hereford, 226 Va. at 608, 311 S.E.2d at 792 (alteration in original) (citation omitted). The corroborating evidence need not be provided by witnesses, but may be furnished by surrounding circumstances adequately established. Penn v. Manns, 221 Va. 88, 93, 267 S.E.2d 126, 130 (1980).
>
> "There is no hard and fast rule that determines whether the requirement of corroboration has been met, and each case must be decided upon its own

contravenes the Fourteenth Amendment to the Constitution of the United States and art. I, § 11 of the Constitution of the Commonwealth of Virginia.

9

facts and circumstances.  Id.  In a case involving parties between whom a confidential relationship existed at the time of the transaction relied on, a higher degree of corroboration may be required than in other transactions.  Everton v. Askew, 199 Va. 778, 782, 102 S.E.2d 156, 158 (1958)."

Without question, the patient and physician relationship that existed between Mr. Dunlap and Dr. Butts was a confidential relationship.  See James v. Jane, 221 Va. 43, 50, 282 S.E.2d 864, 867 (1980); Limbaugh v. Commonwealth, 149 Va. 383, 396, 140 S.E. 133, 136 (1927).  Thus, when, as here, a confidential relationship existed between the parties at the time of the transaction which gave rise to the cause of action, a higher degree of corroboration is necessary to satisfy the requirements of Code § 8.01-397.  For example, we held in Nicholson v. Shockey, 192 Va. 270, 283, 64 S.E.2d 813, 821 (1951), that an attorney/client relationship existed between a son (the attorney) and his mother (the client) and that Code § 8-286, the precursor to Code § 8.01-397, required that the son show a higher degree of corroboration because of the confidential relationship in existence at the time of the challenged transaction.  Accord Vaughan, 248 Va. at 229, 445 S.E.2d at 130; Seaboard Citizens Nat'l Bank of Norfolk v. Revere, 209 Va. 684, 690, 166 S.E.2d 258, 263 (1969); Everton v. Askew, 199 Va. 778, 782, 102 S.E.2d 156, 158 (1958); Clay v. Clay, 196 Va. 997, 1002, 86 S.E.2d 812, 815 (1955).

10

As we have already stated, Dr. Butts was permitted to testify that when he and Mr. Dunlap were alone, Dr. Butts told Mr. Dunlap not to travel to New Orleans, but to go home and return to Dr. Butts' office for a further evaluation in "a week-and-a-half." Dr. Butts also testified that he told Mr. Dunlap to remain at home because "[I]f he goes out of town, he's putting himself at an extra risk." Dr. Butts' purported corroboration of these statements consisted of the testimony of Mr. Dunlap's former neighbor and Mr. Dunlap's brother. The former neighbor testified that Mr. Dunlap "made a statement" that a doctor told him not to go to work for "a couple of weeks or whatever . . . it could have been a couple days." Mr. Dunlap's brother testified that Mrs. Dunlap said that a doctor had told her husband not to return to work. This evidence, along with other evidence of record, is simply not sufficient to provide the higher degree of corroboration required by Code § 8.01-397 and our precedent.

IV.

The plaintiff argues that the trial court erred by submitting the following jury instruction to the jury:

> "Contributory negligence is the failure to act as a reasonable person would have acted for his own safety under the circumstances of this case. A patient is contributorily [sic] negligent when he neglects his health following his physician's treatment, even if that physician's treatment was

11

negligent, and the patient may not recover for any damages resulting from his own neglect.

"If you believe by a preponderance of the evidence that Frank Dunlap was contributorily [sic] negligent, then you may only consider this in determining the amount of damages, if any."

Dr. Butts, relying upon Lawrence v. Wirth, 226 Va. 408, 309 S.E.2d 315 (1983), asserts the trial court correctly granted this jury instruction and that a plaintiff's acts of contributory negligence can be used to decrease the amount of the plaintiff's damages.

We hold that the trial court erred in granting this jury instruction. First, the jury instruction contains an erroneous and confusing statement of law because the instruction implies that the tort concepts of contributory negligence and mitigation of damages are identical concepts when, in fact, they are separate and distinct tort principles. Furthermore, the rule that we articulated in Lawrence has no application here because the admissible evidence of record simply did not permit a jury to find that Mr. Dunlap neglected his health after Dr. Butts' alleged negligent treatment.

V.

In view of our holdings, we need not consider Dr. Butts' remaining arguments. We will reverse the judgment of the trial court and remand this case for a new trial on all issues. Upon remand, the trial court shall not admit any

12

testimony of Dr. Butts concerning conversations that he had with Mr. Dunlap unless Dr. Butts corroborates the conversations to the higher degree required by their confidential relationship.  Nor shall the trial court admit any opinion testimony of Dr. Butts' expert witnesses that rely upon conversations that Dr. Butts had with Mr. Dunlap unless the conversations have been corroborated to the higher degree specified above.  Upon remand, the trial court shall not instruct the jury on contributory negligence or mitigation of damages.

<u>Reversed and remanded</u>.