Jane A. **STEPHENS, et al., Plaintiffs,**

v.

Donald S. **CARUTHERS, Jr.
et al., Defendants.**

No. CIV. A. 99–1192–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 10, 2000.

Stephen Conwell Price, McClandlish & Lillard, Leesburg, VA, for Plaintiffs.

Stephen M. Colangelo, Morrison & Foerster, Washington, DC, Thomas C. Junker, LeClair Ryan, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiffs filed this suit to enforce the terms of an alleged 1981 oral agreement between their now deceased father and stepmother to execute mutual and reciprocal wills designed to ensure that the testators' jointly-owned estate would, on the death of the survivor, pass in equal shares to the father and stepmother's respective heirs. To prove the existence of the alleged agreement, plaintiffs rely in substantial part on the testimony of an heir and her spouse concerning statements made by the deceased testators. This implicates Virginia's Dead Man's Statute, Va.Code § 8.01–397, which provides, in pertinent part, that no judgment shall be rendered against a decedent's estate or her representative in favor of an "adverse or interested party" based on that party's uncorroborated testimony. At issue here, therefore, is whether the spouse of an heir in a will contest is an "adverse or interested party" for purposes of the Dead Man's Statute, when the heir admits that the spouse will share in the proceeds of the litigation should she prevail.

### I

The three plaintiffs, Jane A. Stephens, Chauncey G. Alyea, and James Alyea, are the children of Louis Alyea, who died in September 1993. Defendants include (i) the heirs of Louis Alyea's second wife, Genevieve Alyea,[1] and (ii) the co-executors of Genevieve's estate, Stephen B. Watts and Donald S. Caruthers. The pertinent facts disclose a family history not uncommon for the American scene in the latter

---

1. Named as defendants in the complaint are Genevieve's beneficiaries as reflected in her final will and testament, as well as Genevieve's beneficiaries had she executed the will pursuant to the alleged oral agreement. These beneficiaries include Christine Boucher, Arline Fredsall, Carie Fredsall, James R. Fredsall, Nancy Fredsall, Roger L. Fredsall, Russell Fredsall, Susan Fredsall, Bobbie Ann Othmer, and Janet B. Watts. Apparently unbeknownst to plaintiffs at the time this suit was filed, one of the named defendants, Russell Fredsall, passed away in 1997; plaintiffs have now moved to name his children as defendants in his place. See Rule 25(a), Fed. R.Civ.P. Yet, this motion was apparently not noticed for hearing, and the record does not reflect whether the substituted parties have since been served. In any event, the disposition reflected in this Memorandum Opinion renders this motion moot.

half of the twentieth century. Louis Alyea married his first wife, Virginia Austin, in 1935, and from 1936 until 1943, they had three children together, the plaintiffs in this action. By 1946, however, Louis and Virginia Alyea separated; their divorce became final in 1952, by which time Virginia and the three children had moved to Eustis, Florida. In 1954, Louis Alyea married again, this time to Genevieve Fredsall, a lawyer employed by the federal government, whose heirs are the defendants. Together, Louis and Genevieve bought a house in Falls Church, Virginia, where they remained until their deaths. They had no children together.

In 1956, Jane Alyea married Martin Stephens. At that time, Jane, seeking to establish a closer relationship with her father, made several trips with her husband from their home in Florida to visit Louis and Genevieve in Virginia. Whatever success this effort produced was not permanent, as the relationship apparently became strained once Jane and Martin Stephens had children; Louis and Genevieve Alyea, it seems, did not enjoy the presence of small children in their house. As a result, from 1964 until 1979, Jane's contacts with her father and stepmother were primarily by mail and telephone.

Chauncey Alyea's relationship with his father and stepmother was of a similar nature. During the period from 1965 until 1967, Chauncey lived in the Washington, D.C., area, and saw Louis and Genevieve only occasionally. Eventually, Chauncey returned to Florida, where in 1971 he married, and later had children. He and his family traveled from Florida to Falls Church, Virginia, to visit Louis and Genevieve on various occasions throughout the 1970s and 1980s.

James Alyea, who also lived in the Washington, D.C., area, apparently had little or no contact with his father and stepmother until 1979, when he was hospitalized as a result of a serious automobile accident. Based on their past differences, Louis Alyea at first would not visit his son

in the hospital, but at Jane's urging, he eventually relented. After visiting James at the hospital, Louis, apparently moved by his son's brush with death, hired a lawyer to defend him in the lawsuit arising from the accident.

Old wounds began to heal, and from that time until Louis's death in 1993, James spent more time with his father and his stepmother. Indeed, the event apparently kindled a family renewal of sorts, as all three children began spending more time with Louis and Genevieve, visiting more frequently and sharing important events together. For example, James celebrated his fiftieth birthday with his father and stepmother, and all of Louis's children were present for Louis's eightieth birthday celebration in 1992. And at some point in the 1980s, Louis and Genevieve Alyea began an annual tradition of giving each of Louis's children a Christmas gift of $500. Plaintiffs each believe that Louis regretted his shortcomings as a father and sought to make amends by making generous cash gifts to his children during his life, and by providing that his children would receive half of his estate after his death. As evidence of Louis's graciousness, Chauncey claims that his father made several comments to the effect that he was wealthy and planned to share his wealth with his children, including the statements, "I am a millionaire," "I have more money than I can possibly spend," "your [plaintiffs'] children have been taken care of in our wills," and "we [Louis and Genevieve Alyea] are leaving everything to the survivor and then the estate is to be split between the two families."

Plaintiffs also contend that in 1987 Louis and Genevieve told Jane and Martin Stephens that they had agreed to execute mutual and reciprocal wills. According to the Stephens, Louis, in this conversation, said (i) that he and Genevieve had "agreed that our estate will be divided evenly between our two families," and (ii) that the property was jointly owned to avoid the expense of probate and estate taxes when

the first one died. Genevieve allegedly affirmed her husband's statement by saying, "That's right." The morning after this conversation, Martin Stephens claims he compared Louis's and Genevieve's wills, and concluded that one was indeed the mirror image of the other. The Stephens's testimony concerning this 1987 conversation is central to plaintiffs' suit.

Louis passed away in September 1993. His will, executed on February 20, 1981, was consistent in significant respects with the conversation Louis and Genevieve allegedly had with Jane and Martin Stephens in 1987. Specifically, Louis's will provided (i) that in the event Genevieve were to survive him, Louis's estate would pass to Genevieve, and (ii) that in the event Louis were to survive Genevieve, the estate would be shared equally between Louis's and Genevieve's respective heirs. The will also reflected that Genevieve and Louis then jointly owned the entire estate. Yet, not all aspects of the alleged 1987 conversation are reflected in Louis's will; it contained no reference to Genevieve's will, nor any language indicating that it was mutual and reciprocal with respect to her will. In any event, by the terms of Louis's will and the fact that Louis and Genevieve were joint owners of Louis's estate, Genevieve, as the survivor, assumed sole ownership of the joint estate.

After the death of their father, plaintiffs maintained contact with Genevieve, although visits from the out-of-town plaintiffs were less frequent. Only James, who lived in the Washington, D.C., area, saw his stepmother regularly. Jane and her husband, Martin, made occasional trips from Florida to see Genevieve, and Jane and Genevieve also corresponded. Occasionally, the correspondence and conversations between Jane and Genevieve touched on financial matters, including the ultimate disposition of the Alyea estate. Yet, none of the letters written by Genevieve and conversations between Jane and Genevieve

mentioned the alleged oral agreement between Louis and Genevieve to execute mutual and reciprocal wills. In a letter dated November 4, 1993, Genevieve advised Jane that she planned to make a cash gift to Jane by making her joint owner of a $25,000 bank account. In the same letter, Genevieve described Louis's will, and noted that she filed it, although she was not required to, as the estate was jointly owned. Genevieve assured Jane that, "I trust you know that I will do everything I can to ensure that your father's wishes are carried out." The remaining correspondence in the record did not discuss Louis's will or Genevieve's plans for disposition of her estate, although it does reflect that Jane and Genevieve maintained a cordial relationship in the years following Louis's death.

On at least one occasion, plaintiffs contend that Genevieve spoke with Jane and Martin about her plans for her estate. In August 1995, Genevieve allegedly asked Jane a series of probing and frank questions about the Stephens's financial affairs. After Jane noted that she and her husband faced significant financial hurdles, including a mortgage on their home and debt from their children's college educations, Genevieve allegedly assured her, "I need to make some changes in my will and now I know what to do. You and Janet [Genevieve's niece, Janet Watts] are going to be residual legatees.... Roger [Genevieve's brother] has plenty of money." Plaintiffs claim that Genevieve later repeated the comment about making Jane a residual legatee in Martin's presence.

Genevieve died in May 1999. Her last will and testament, executed on December 22, 1995, was far from a mirror image of Louis's. Instead, Genevieve left a specific cash bequest to each of the plaintiffs, totaling $100,000.[2] Similarly, the will provided specific bequests for most of Genevieve's nieces and nephews, except that her brother (now deceased) and her niece each re-

---

**2.** Specifically, Genevieve Alyea left plaintiff Jane Stephens $50,000, plaintiff James Alyea $25,000, and plaintiff Chauncey Alyea $25,000.

ceived half of the residual estate. Plaintiffs claim that Genevieve's estate was worth approximately $3.0 million at her death, which is substantially the same as the value of the estate six years earlier at the time of Louis's death.

Plaintiffs now claim that in 1981 Genevieve and Louis Alyea agreed to execute mutual, reciprocal, and hence irrevocable wills, to provide that their jointly-owned estate would eventually pass in equal parts to his heirs and to hers. If this agreement existed, Louis performed his obligation by executing his 1981 will and not revoking it before he died, while Genevieve breached the agreement by executing a will not in conformity with the agreement, thereby revoking her earlier, conforming will, assuming that such a will existed. Plaintiffs now seek to enforce the terms of the alleged 1981 oral agreement. Specifically, plaintiffs claim that Genevieve's will should have distributed her estate consistent with paragraphs 3.A and 3.B of Louis's will, which provide how Louis's estate would have been distributed had he survived his wife.

Defendants now seek summary judgment, on the ground that the sole evidence offered as proof of the oral agreement may not be relied upon pursuant to the terms of Virginia's Dead Man's Statute, *see* Va. Code § 8.01–397, and that, even assuming the Dead Man's Statute is satisfied, plaintiffs have not proffered sufficient evidence to survive summary judgment.

## II

■ Established Virginia law holds that two testators may enter into a contract to execute mutual and reciprocal wills,[3] and that by doing so, each testator is bound to bequeath his or her estate according to the terms of the agreement.[4] In essence, mutual and reciprocal wills are the product of a contract by which each party agrees (i) to execute a will according to certain terms, and (ii) not to revoke the will so executed.[5] Where two testators make such a contract, the will executed pursuant to that contract therefore becomes irrevocable with respect to the agreed terms. *See Williams*, 96 S.E. at 750.[6] In that event, when the survivor fails to execute a will that conforms to the agreement, or revokes a previously execut-

3. Mutual and reciprocal wills, such as those alleged in this case, are two separate wills, each containing similar terms with respect to the ultimate disposition of the testators' property. *See, e.g., Black v. Edwards*, 248 Va. 90, 91–94, 445 S.E.2d 107, 108–10 (1994) (holding that two mirror image wills were mutual and reciprocal). A joint and mutual will is a single instrument executed by two or more testators, that similarly provides for the ultimate disposition of the testators' property. *See Williams v. Williams*, 123 Va. 643, 96 S.E. 749, 750–53 (1918) (discussing joint and mutual wills).

4. *See Black*, 248 Va. at 91–94, 445 S.E.2d at 108–10 (finding that two mirror image wills were the product of a contract to execute mutual and reciprocal wills); *Williams*, 96 S.E. at 750 (1918).

5. *See Black*, 248 Va. at 91–93, 445 S.E.2d at 108–109 (finding that mirror image wills were mutual and reciprocal based on the scrivener's testimony that the parties intended that the wills would be irrevocable); *Stevens v. Rittenberry*, 1998 WL 972240 (Va. Cir. Ct.1998) (finding that mirror image wills

were not mutual and reciprocal in absence of evidence that parties intended the wills to be irrevocable); *cf. Williams*, 96 S.E. at 753 (noting in dicta that "[i]f two persons make wills, each devising his property to the other, there is no necessary inference that the wills were the result of any mutual or reciprocal agreement or understanding").

6. The enforcement of a contract to execute a will according to certain terms is in tension with the long-established principle that "wills are in their nature ambulatory or revocable," and that even a joint will executed by two parties may be revoked by the survivor of the pair. *Williams*, 96 S.E. at 750 (1918). This principle derives from the fundamental nature of a will as a gift, albeit a testamentary gift, and promises of gifts are, in most instances, not binding. *See id.* Yet, where two parties agree to execute mutual and reciprocal wills, and that agreement is reflected in the will, that aspect of the will assumes the properties of a contract, and is therefore binding on the contracting parties. *See id.*

ed conforming will, the person or persons whom the promised will would have benefitted may sue to "prevent ... [the] revocation which would destroy the compact or the trust created" in their favor by the testators' contract. *Williams*, 96 S.E. at 750. Of course, while both testators are still living, they may agree to change, modify or revoke an agreement to execute mutual and reciprocal wills. But if there is no change, modification, or revocation by the testators, and one of them dies having performed, the other party's final will and testament must conform to the agreement. *See Williams*, 96 S.E. at 751 (finding that a "mutual agreement between the cotestators" to a joint will "became fully executed ... and irrevocable by the survivor" on the death of the first decedent). In that event, the survivor's will becomes, in effect, irrevocable.

■■■ Evidence of the testators' contract to execute mutual and reciprocal wills may be adduced from several sources. Thus, it may appear in the terms of the wills executed pursuant to the contract; it may be apparent from the testimony of "competent witnesses who testify to admissions of the testators"; or it may be im-

plicit in "the circumstances and relations of the parties and [the terms of] the instrument." [7] Yet, where the person seeks to enforce a contract to execute a will that contradicts the terms of the decedent's final will, the person will prevail only upon a showing of "clear, definite and convincing evidence that with reasonable certainty establish[es] the making of the contract and [proof of] its terms." [8]

Thus, to prevail at trial plaintiffs must prove, by clear and convincing evidence, that Louis and Genevieve agreed to execute mutual and reciprocal wills. Specifically, plaintiffs must prove that the decedents agreed to execute wills providing that the survivor's estate would pass in equal parts to his heirs and to hers, and that the will executed in conformity with the agreement would be irrevocable. Yet, the only evidence that Louis and Genevieve made such an agreement is the testimony of Jane and Martin with respect to the 1987 conversation, and according to Virginia's Dead Man's Statute, the uncorroborated testimony of an "adverse or interested party" may not form the basis of a judgment against the decedent's estate in the adverse or interested party's favor. *See* Va.Code 8.01–397.[9] In this regard,

---

7. *Williams*, 96 S.E. at 751; *see also Black*, 248 Va. at 93, 445 S.E.2d at 109 (finding that testimony of attorney who drafted mirror image wills for deceased spouses established that the spouses intended the wills to be mutual and reciprocal).

8. *Blincoe v. Blincoe*, 209 Va. 238, 244, 163 S.E.2d 139, 143 (1968); *see also Black*, 248 Va. at 92, 445 S.E.2d at 109 (acknowledging that a contract to execute mutual and reciprocal wills will be enforced only on "clear and satisfactory" proof); *Williams*, 96 S.E. at 751 ("Undoubtedly the proof of the agreement and consideration must be clear and satisfactory."). Similarly, Virginia law recognizes the risk of fraud in a will contest, and requires the trial court to "accept with caution and examine with scrutiny the evidence proffered" in support of an oral contract that deviates from the terms of a decedent's will. *Blincoe*, 209 Va. at 244, 163 S.E.2d at 143.
The reported cases in which courts have recognized an oral contract to execute a will illustrate the high burden that plaintiffs must bear. *See Black*, 248 Va. at 91–93, 445

S.E.2d at 108–09 (testimony of scrivener of mirror image wills established that parties knew the wills were intended to be mutual and reciprocal and, hence, irrevocable); *Clark v. Atkins*, 188 Va. 668, 51 S.E.2d 222 (1949) (oral agreement to make a will corroborated by the testimony of nine witnesses, most of whom were disinterested); *Timberlake's Administrator v. Pugh*, 158 Va. 397, 401, 163 S.E. 402, 404 (1932) (plaintiff's testimony that decedent agreed to bequeath her his house in exchange for her services, and the testimony of two disinterested witnesses that the decedent asked them to help draft a will devising his house to claimant, was sufficient to support jury verdict in favor of claimant).

9. This statute provides, in pertinent part, as follows:

In an action by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, *no judgment or decree shall be rendered*

Jane's testimony falls squarely within the terms of the Statute: She is indisputably an "adverse party" and her testimony thus must be corroborated before it can serve as the basis of a judgment against Genevieve's estate in her favor. *See id.; Merchants' Supply Co., Inc., v. Hughes' Ex'rs*, 139 Va. 212, 123 S.E. 355, 356 (1924) (noting that an "adverse party" is "one who is a party to the record"). As corroboration for Jane's testimony, plaintiffs offer the testimony of her husband, Martin, who also witnessed the critical 1987 conversation. But, of course, Martin's testimony cannot serve to corroborate his wife's testimony unless Martin himself is not an "adverse or interested party." [10] So the question sharply presented is whether Martin's status as a party's spouse, by itself, or in conjunction with other factors present here, mark him as an "adverse or interested party."

No Virginia authority directly addresses this question.[11] Yet, existing authority does make clear that the phrase "adverse or interested party" refers to two, distinct categories of persons, namely "adverse" parties and "interested" parties. *See Atlantic Coast Realty Co. v. Robertson's Ex'r*, 135 Va. 247, 116 S.E. 476, 480 (1923).[12] And the case law further confirms that an "adverse party" is "one who is a party to the record," [13] while an "interested party" "is one, not a party to the record, who is pecuniarily interested in the result of the suit." *Merchants' Supply Co.*, 123 S.E. at 356 (1924).[14]

> *in favor of an adverse or interested party founded on his uncorroborated testimony.* In any such action, whether such adverse party testifies or not, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence in all proceedings including without limitation those to which a person under a disability is a party.
>
> Va. Code § 8.01–397 (emphasis added).

10. *See Ratliff v. Jewell*, 153 Va. 315, 326, 149 S.E. 409, 412 (1929) (noting that one interested witness may not corroborate the testimony of another interested witness).

11. The Supreme Court of Virginia, in a series of cases issued many decades ago, articulated the basic principles underlying construction of the phrase "adverse or interested party" in the Dead Man's Statute. *See Ratliff*, 153 Va. at 324–25, 149 S.E. at 411–12; *Merchants' Supply Co.*, 123 S.E. at 356; *Atlantic Coast Realty Co. v. Robertson's Ex'r*, 135 Va. 247, 116 S.E. 476 (1923); *Robertson's Ex'r v. Atlantic Coast Realty Co.*, 129 Va. 494, 106 S.E. 521 (1921).

12. The Dead Man's Statute, both in its current form and in the form considered by the *Atlantic Coast Realty* court, refers in one clause to "an adverse or interested party," and in another clause solely to an "adverse party." Based on this language, the *Atlantic Coast Realty* court concluded that the General Assembly intended to distinguish between "adverse" and "interested" parties for purposes of the Statute. *See* 116 S.E. at 480.

Similarly, the provision that, by its terms, eliminates the common law and statutory disqualifications of witnesses, states that "[n]o person shall be incompetent to testify because of interest, or because of his being a party to any civil action," thus recognizing the distinction between those who are interested, and those who are a party to the action. Plaintiff contends that § 8.01–396 refers to yet a third category of witnesses, namely, "interested persons," distinct from "interested parties." On close examination, it is clear that § 8.01–396 makes no such distinction. Instead, it states that "[n]o person shall be incompetent to testify because of interest, or because of being a party to any civil action." Va. Code § 8.01–396. In that case, the word "interest" is used as a noun, not an adjective as in the phrase "interested party." Thus, comparison of these statutes does not compel a conclusion that the general assembly considered "interested persons" to be somehow distinct from "interested parties."

13. Virginia's Dead Man's Statute eschews formalism; the testimony of an "adverse party" need not be corroborated, if that party is not "beneficially interested in the judgment which is sought to be obtained." *See Arwood v. Hill's Adm'r*, 135 Va. 235, 117 S.E. 603, 606 (1923). In any event, it will be the rare case when a party to a lawsuit lacks a pecuniary interest in the outcome of the suit.

14. *See also Ratliff*, 153 Va. at 325, 149 S.E. at 411–12 (1929) (discussing when a person's financial stake in litigation makes that person an "interested party"); *Atlantic Coast Realty Co.*, 116 S.E. at 480 ("[W]e must hold that

Martin, it is clear, is not a party to this lawsuit, or not otherwise a "party to the record," and thus is not an "adverse party." The sole question, therefore, is whether Martin is an "interested party," for if he is, then his testimony may not serve to corroborate his wife's testimony. Whether the spousal relationship by itself renders Stephens "interested" is doubtful, both on principle[15] and because authority from Virginia[16] and elsewhere[17] point per-

---

one who has a pecuniary interest in the recovery, although not a party to the record, is a witness requiring corroboration.").

15. Under Virginia law, a husband has no legal interest in his wife's separately owned property, including any inheritance that the wife receives during the marriage. See Va. Code § 55-35 ("A married woman shall have the right to acquire, hold, use, control and dispose of property as if she were unmarried . . . ."); Va.Code § 20-107.3(A)(1)(ii) (for purposes of divorce, a spouse's "[s]eparate property" includes, inter alia, "all property acquired during the marriage by bequest, devise, descent, survivorship or gift from a source other than the other party"); 9B Michie's Jurisprudence of Virginia and West Virginia § 31 (discussing a wife's right to maintain a separate estate). Thus, Martin's pecuniary interest in Jane's inheritance depends entirely on her decision to share it with him.

16. The silence of the Supreme Court of Virginia on this issue in Ratliff is instructive. In that case, the court determined that a person's wife was an interested party with respect to her husband's claim against a decedent, when she and her husband were jointly liable on a debt to the decedent, and the debt would be extinguished in full by her husband's claim. See Ratliff, 153 Va. at 325, 149 S.E. at 411–12. Were a person an "interested party" in regard to his or her spouse's litigation merely by virtue of the marital relationship, Ratliff would have been a much simpler case, and the court would not have examined the nature of the wife's pecuniary interest as the decedent's debtor. Thus, Ratliff is similar to cases from other jurisdictions that recognize the marital relationship, by itself, does not create a pecuniary interest in litigation, but that a spouse's interest in litigation may be otherwise evident from the circumstances. See, e.g., Wright v. NeSmith, 594 So.2d 1210, 1213 (Ala.1992) (finding that a spouse was independently interested in litigation in which her husband was a defendant, based on the impact a judgment entered against him would have on their house and her lifestyle).

17. Most jurisdictions have determined that a person is not an interested party with respect to litigation involving his or her spouse, unless the person has an actual, vested pecuniary interest in the outcome of the litigation. See, e.g., In re Estate of Grossman, 486 Pa. 460, 406 A.2d 726, 732 (1979) ("[T]he general interest of a spouse in the prosperity of the other is insufficient to meet the requirement of the Dead Man's Statute . . . ."); In re Estate of Christen, 72 Wis.2d 8, 239 N.W.2d 528, 530–31 (1976) (person's interest in litigation to which his or her spouse is a party is contingent and remote and does not render a person "interested" under Wisconsin's Dead Man's Statute); Farah v. Stout, 112 Md.App. 106, 684 A.2d 471, 476 (Md.Ct. Spec.App.1976) (nonparty husband was an interested party in contract dispute because he and his wife, a party to the litigation, were both parties to the contract in dispute); Boettcher v. Busse, 45 Wash.2d 579, 277 P.2d 368, 370 (1954) (finding that a spouse was interested under community property laws, because "[a]ny property acquired by this suit would be the community property of appellant and his wife").

Other courts have ruled that a spouse is an interested party, if the facts of the case indicate that the spouse has an actual financial interest in the outcome of litigation, even if that interest is not, in a technical sense, vested. See, e.g., Wright, 594 So.2d at 1213 (finding that a spouse was interested in litigation in which her husband was a defendant, because her financial livelihood depended on his, and because the house they shared would likely be sold to satisfy any judgment); Scheu v. Blum, 136 A.D. 592, 121 N.Y.S. 122, 123 (N.Y.App.Div.1910) (holding that a husband's admission that he and his wife, the plaintiff, " 'had just one fund,' " and " '[w]hat was mine was hers, and what was hers was mine,' " was sufficient to establish that the husband was an interested party); but see In re Manchester's Estate, 279 A.D. 254, 110 N.Y.S.2d 107, 109 (N.Y.App.Div.1952) (distinguishing Scheu on the ground that the record in that case had more evidence of interest, while also noting that "[i]t is doubtful if [Scheu] would be decided the same way today").

Only one state, West Virginia, appears to hold that a spouse is an interested party merely by virtue of the marital relationship. See Kuhn v. Shreeve, 141 W.Va. 170, 89 S.E.2d 685 (1955), overruled on other grounds, Meadows v. Meadows, 196 W.Va. 56, 468 S.E.2d 309 (1996).

suasively to this result. In any event, it is unnecessary to resolve this question because there exists in this case an additional factor that is dispositive in this regard: Jane has admitted in her deposition testimony that her husband will share in her inheritance should she prevail in this litigation. Where, as here, the party to the record declares that her spouse will share in the inheritance, should the will contest succeed, the spouse is an "interested party" whose testimony may not serve as corroborating evidence under the Dead Man's Statute. This result follows from the test for determining when a party is "interested" under Virginia law.

■■ The Supreme Court of Virginia has noted that a person is an interested party when that person is "in some way . . . beneficially interested in the judgment or decree which is sought to be obtained." *Robertson's Ex'r v. Atlantic Coast Realty Co.*, 129 Va. 494, 106 S.E. 521, 524 (1921). In that regard, a person has a beneficial

interest in litigation where, *inter alia*, that person has "an interest in the property concerned in the litigation which may be beneficial [sic] or adversely affected by the result of the suit" or "a beneficial interest in the fund sought to be recovered." *Ratliff*, 153 Va. at 324, 149 S.E. at 411 (citation and internal quotation marks omitted).[18] In determining whether a person is "interested" under the analysis, the operative factor is the person's *financial stake* in the litigation, rather than the person's legal or personal association with the party to the litigation.[19] Thus, where a corporation is a party to litigation, the corporation's stockholders are "interested" parties by virtue of their pecuniary interest in the corporation,[20] while agents or employees of the corporation may not be classified as interested merely by virtue of their legal relationship to the corporation.[21] Similarly, it is clear that the witness's financial interest in the litigation must exist at the time his testimony is given.[22] Thus, a person is an

Of course, case law construing the Dead Man's Statutes of other jurisdictions must be considered with care, as the Dead Man's Statutes in many of those jurisdictions, including the states cited in the preceding paragraphs, render interested witnesses *incompetent* to testify in certain circumstances, while Virginia's simply requires corroboration. *See Atlantic Coast Realty*, 116 S.E. at 479 (noting that case law construing statutes that result in the disqualification of witnesses are distinguishable in light of Virginia's corroboration rule).

18. The *Ratliff* court describes an interested party as follows:

A disqualifying interest may result from the witness being liable for the debt therefor, liable to reimburse the party for whom his testimony is offered in case the decision is against such party, or subject to liability from which the success of the party in whose favor he would testify would relieve him, an interest in the property concerned in the litigation which may be beneficial or adversely affected by the result of the suit, a beneficial interest in the fund sought to be recovered, or a liability for costs of the action.

*Ratliff*, 153 Va. at 324, 149 S.E. at 411 (citation and internal quotation marks omitted).

19. *See Robertson's Ex'r v. Atlantic Coast Realty Co.*, 129 Va. 494, 106 S.E. 521, 524 (1921).

20. *See Merchants' Supply Co.*, 123 S.E. at 356 ("Fretwell, being a large stockholder in the plaintiff company, is necessarily an 'interested' party whose testimony must be corroborated before any judgment can be founded thereon."); *Atlantic Coast Realty Co.*, 116 S.E. at 480 ("There can be little doubt that a stockholder in a corporation is one who has a pecuniary interest in the result when such corporation is a party to the litigation in which a judgment is sought by or against it.").

21. *See Robertson's Ex'r*, 106 S.E. at 524 (1921) (finding that a corporation's contracting agent lacks a pecuniary interest in the outcome of litigation involving the corporation); *Ruhland v. Copperstone Center Medical Associates*, 870 F.2d 655, 1989 WL 21351 (4th Cir. March 1, 1989) (unpublished disposition) (finding that a person was not an interested party by virtue of being an employee of the defendant company); *cf. In re McGolerick*, 1981 WL 180489 (Va. Cir. Ct. Jan.28, 1981) (noting that a person is not interested in litigation by virtue of her friendship with a party).

22. *See Atlantic Coast Realty Co.*, 116 S.E. at 479 (noting that a stockholder who sold his stock in the corporation prior to trial was not an interested party with respect to litigation involving that corporation).

"interested" party, only where the person has an actual and present financial stake in the outcome of the litigation.

 It is also clear in Virginia that a person's pecuniary interest in the outcome of litigation may be made manifest by circumstances external to the precise legal claim for which the testimony is introduced. Consistent with the principle that a person is an interested party when that person is "in *some way* . . . beneficially interested in the judgment or decree which is sought to be obtained,"[23] the Supreme Court of Virginia has determined that a person's interest in the outcome of litigation may be made "plainly manifest" from circumstances external to the legal claim. *See Ratliff*, 153 Va. at 322, 149 S.E. at 410–11. Thus, a person may be an interested party, even where that person is not a party to the actual legal claim, and the "judgment as entered [is not] in terms in [the person's] favor." *Id.*, 149 S.E. at 410–11. For example, in *Ratliff*, a husband possessed a claim against a decedent, which, if successful, would have extinguished the debt owed by the husband and his wife jointly to the decedent, and for which the decedent's estate had sued to recover. On these facts, the Supreme Court of Virginia held that the wife's testimony could not corroborate her husband's under the Dead Man's Statute because her own interest in the husband's claim was "plainly manifest"; their joint debt to the decedent's estate would be "cancelled and satisfied" should judgment be rendered in her husband's favor on his claim. *Id.*, 140 S.E. at 411. Put differently, the wife had a direct, financial interest in the outcome of the litigation, even though she was not a direct beneficiary of her husband's claim.[24]

Similarly, in this case, Martin's interest in the outcome of his wife's litigation is "plainly manifest," in light of Jane's sworn testimony that he will share in her inheritance if she prevails here. This testimony is consistent with their past practice: The record reflects that Jane had shared previous monetary gifts from her father and stepmother with her husband, typically by placing the funds in a joint account. Thus, while Martin's interest in the outcome of the litigation is, in a formal sense, contingent on his wife's independent decision whether ultimately to share her inheritance with him, his actual interest in the litigation is made "plainly manifest" by the record; she has admitted that this litigation is for his immediate financial benefit, as well as for hers. In sum, because Martin has an immediate and direct financial interest in the outcome of this litigation, his testimony may not be used to corroborate that of his wife.

This does not end the analysis, however, for it remains to be determined whether Jane's and Martin's testimony is otherwise sufficiently corroborated in the record to survive summary judgment. The question whether adverse or interested testimony is sufficiently corroborated is not subject to "any hard and fast rule"; rather, "each case must be decided upon its own facts and circumstances." *Brooks v. Worthington*, 206 Va. 352, 357, 143 S.E.2d 841, 845 (1965). It is typically a question of fact, which "in quantity . . . [,] must be more than a scintilla" to create a triable issue. *Timberlake's Administrator v. Pugh*, 158 Va. 397, 403, 163 S.E. 402, 404 (1932).

 The Supreme Court of Virginia has identified the key principles that govern the question whether evidence corroborates interested or adverse testimony. *See Hereford v. Paytes*, 226 Va. 604, 608, 311 S.E.2d 790, 792 (1984) (discussing the principles). In essence, corroborative evidence is "evidence [that] tends to confirm

23. *Robertson's Ex'r*, 106 S.E. at 524 (emphasis added).

24. *Cf. Wright v. NeSmith*, 594 So.2d 1210, 1213 (Ala.1992) (holding that, under Alabama's Dead Man's Statute, a party's wife had "a direct and immediate pecuniary interest in the outcome of trial" when the record reflected that a judgment against her husband could result in the loss of their house and a decline in her standard of living).

and strengthen the testimony of the witness," and demonstrates the "probability of its truth." *Id.*, 311 S.E.2d at 792. Thus, the testimony need not be corroborated on "all material points," and the "corroborative evidence [need not] be sufficient by itself to support a verdict"; instead, the corroborative evidence need only give the testimony "more strength than was had before." *Id.*, 311 S.E.2d at 792 (citations and internal quotation marks omitted).[25] But evidence does not corroborate adverse or interested testimony when it merely confirms or supports a fact the testimony might reflect, but is not otherwise in dispute. Instead, to be corroborative of the interested testimony, the evidence must support the testimony "on some essential fact *whose establishment* is necessary to sustain the judgment." *Ratliff*, 153 Va. at 326, 149 S.E. at 412 (emphasis added). Put another way, corroborative evidence "support[s] some essential allegation or issue raised by the pleadings ... which ..., *if unsupported*, would be fatal to the case." *Vaughn v. Shank*, 248 Va. 224, 227, 445 S.E.2d 127, 129 (1994) (emphasis added). Accordingly, where the interested party's testimony is admitted to prove an essential, disputed allegation, the evidence offered as corroboration must enhance the probability that the disputed

allegation is true.[26] Yet, evidence is not corroborative simply because it is consistent with the disputed allegation; instead, the evidence offered as corroboration must "of itself, without the aid of any other evidence, exhibit its corroborative character by pointing with reasonable certainty to the allegation or issue which it supports." *Timberlake's Adm'r*, 158 Va. at 403, 163 S.E. at 404. Evidence that is neutral with respect to the truthfulness of the essential allegation is thus not sufficient corroboration within the meaning of the Dead Man's Statute.[27]

 In this case, the disputed allegation for which the testimony is offered is the existence of an oral agreement to execute mutual and reciprocal wills. So, the evidence proffered as corroboration must increase the probability that the oral agreement was made. Yet, assuming that Jane's and Martin's proffered testimony, if believed, establishes the existence of the decedents' oral agreement to execute mutual and reciprocal wills, the record contains no other evidence that Genevieve and Louis bound each other by contract to execute mutual and reciprocal wills. First, the sole evidence that Genevieve ever executed a mirror image of her husband's will is found in Jane's and Martin's testimony, and accordingly their testimony that Gene-

---

25. The Supreme Court of Virginia distinguishes "corroboration," which the Dead Man's Statute requires, from "confirmation," which the Statute does not require. *See Hereford*, 226 Va. at 608, 311 S.E.2d at 792 (citing *Brooks*, 206 Va. at 357, 143 S.E.2d at 845). Specifically, the court has noted that "[c]onfirmation is not necessary for that removes all doubt, while corroboration only gives more strength than was had before." *Id.* at 608, 311 S.E.2d at 792 (citations and internal quotation marks omitted).

26. *See Vaughn*, 248 Va. at 229, 445 S.E.2d at 130; *Penn v. Manns*, 221 Va. 88, 94, 267 S.E.2d 126, 130 (1980) (defendant in wrongful death action testified that decedent, while being driven to the hospital by defendant after decedent suffered a gunshot wound, fainted and fell onto the defendant and caused the accident that resulted in decedent's death, and was corroborated by medical testimony

that the decedent's wound could have caused him to faint); *Taylor v. Mobil Corp.*, 248 Va. 101, 110–11, 444 S.E.2d 705, 710 (1994) (finding that question of corroboration was properly submitted to the jury, when two disinterested witnesses corroborated the substance of essential portions of the adverse party's testimony).

27. *See Vaughn*, 248 Va. at 230, 445 S.E.2d at 130 (noting that testimony did not corroborate the existence of a contract when the testimony received was "equally consistent with an unenforceable promise"); *Hereford*, 226 Va. at 609–10, 311 S.E.2d at 792–93 (1984) (noting that "ambivalent circumstantial evidence" of circumstances surrounding an automobile accident did not corroborate the testimony of the sole survivor of the crash, as the evidence was perfectly consistent with both his version of the crash, and a version by which he would have been at fault).

vieve actually executed a mirror image will finds no corroboration in the record.[28] The record is similarly devoid of any evidence that Genevieve and Louis told disinterested third parties, or other interested or adverse parties for that matter, that they had agreed to execute mutual and reciprocal wills.[29] Nor, significantly, is there any evidence of such an agreement in Louis's will, which is silent on the question whether Genevieve had agreed to execute a will that was mutual and reciprocal with respect to his.[30] And although the record reflects that had Louis survived his wife, he would have bequeathed his estate equally between his heirs and hers, there is simply no evidence in the record, other than Jane's and Martin's testimony, that

Genevieve ever bound herself by contract to follow her husband's lead.[31]

In fact, most of the so-called corroborating evidence is either silent as to the alleged oral agreement, or diminishes the probability that the agreement existed. The comments allegedly made by Louis to Chauncey and his wife, Ann,[32] in the 1970s and 1980s reflect Louis's desire to provide for his children on his death, but do not support the existence of an oral agreement between Louis and his wife.[33] Similarly, the correspondence between Jane and Genevieve is silent on the question whether Genevieve was bound to execute a will that was the mirror image of Louis's, and actually suggests that Genevieve did not believe she was so bound.[34] In short, the

**28.** *Cf. Black v. Edwards*, 248 Va. 90, 92, 445 S.E.2d 107 n., 248 Va. 90, 445 S.E.2d 107, 109 n. (1994) (referring to the terms of the improperly revoked mutual will, indicating that the instrument was actually produced).

**29.** *See Black*, 248 Va. at 91–92, 445 S.E.2d at 108 (finding sufficient evidence of intent to execute mutual and reciprocal wills, when lawyer who drafted mirror image wills testified that he told the decedents at the time of execution that the "ultimate survivor" of the two would agree not to revoke the will).

**30.** *Cf. Black*, 248 Va. at 91–93, 445 S.E.2d at 108–09 (mirror image wills executed by spouses did not contain language memorializing the testators' intent to execute mutual and reciprocal wills, but testimony of scrivener established that testators intended the wills to be mutual and reciprocal and, hence, irrevocable).

**31.** *See Stevens v. Rittenberry*, 1998 WL 972240, at \*2 (Va. Cir. Ct. June 15, 1998) (finding that evidence of a present intention shared by two parties to leave their estate to the survivor of the two of them, and then to a third party, did not establish the existence of an agreement never to deviate from that intent).

**32.** Chauncey, as a party to this lawsuit, is an adverse party, and thus, assuming his testimony was probative of the existence of the agreement, his testimony would also need corroboration. Presumably, his wife could offer sufficient corroboration in this regard, as she was present for at least some of the conversations between Chauncey and his father, and defendants have not shown that she

is actually interested in the outcome of this litigation. In any event, the testimony of Chauncey and his wife is not probative of whether the agreement existed, nor does it corroborate the testimony of Jane and Martin in that regard.

**33.** As noted above, Louis allegedly told Chauncey and Ann Alyea, "I am a millionaire," "I have more money than I can possibly spend," "your [plaintiffs'] children have been taken care of in our wills," and "we [Louis and Genevieve Alyea] are leaving everything to the survivor and then the estate is to be split between the two families." None of these statements support the existence of an oral agreement to execute mutual and reciprocal wills. Indeed, Genevieve's will is consistent with Louis's statement, as her will "split[s the estate] between the two families," just not in the proportion that plaintiffs had hoped.

**34.** In a letter Genevieve wrote to Jane after Louis's death, she stated, "I trust you know that I will do everything I can to ensure that your father's wishes are carried out." This does not support the existence of an oral agreement to execute mutual and reciprocal wills; if such an agreement existed, Genevieve Alyea would have had to do nothing to carry out her husband's wishes, as the terms of her will would have been established. Similarly, the August 1995 conversation, in which plaintiffs claim that Genevieve told Jane, "I need to make some changes in my will and now I know what to do," and then indicated that Jane and Genevieve's niece, Janet Watts, would be residual legatees, does not corroborate the existence of an oral

evidence in the record does not support, or even suggest, the conclusion that Louis and Genevieve agreed to execute mutual and reciprocal wills.

Finally, plaintiffs contend that Jane's testimony is corroborated by the underlying theme of plaintiff's case, namely that the case represents the classic story of a stepmother's efforts to disinherit her husband's natural heirs after his death. Further, the record reflects that the natural objects of Genevieve's bounty, her heirs, were different from the natural objects of Louis's bounty, his children. Indeed, the record viewed in a light favorable to the plaintiffs suggests that Louis grew fond of his children in his old age, and sought to provide for them in his later years. Over time, his testamentary interests may have diverged from those of his wife, who apparently enjoyed the company of Louis's children, but was fonder of her own natural heirs, especially her brother, Roger Fredsall, and her niece, Janet Watts. Accordingly, plaintiffs argue that Louis, to ensure that his children would receive a portion of his estate after he and Genevieve passed away, agreed with Genevieve to execute mutual and reciprocal wills providing how their estate would be distributed after they both had died. But this is simply plaintiffs' theory of the case, and plaintiffs' theory by itself presents no *evidence* that Louis and Genevieve agreed to execute mutual and reciprocal wills with their respect to their joint estate.[35] In short, without Jane's and Martin's testimony, plaintiffs' theory of the case carries no weight, and to allow that theory to supply the necessary corroboration would render the corroboration requirement nugatory.

For these reasons, no reasonable factfinder [36] could conclude that the evidence presented by plaintiffs in this case corroborates the interested testimony of Martin Stephens and the adverse testimony of Jane Stephens to the effect that Louis and Genevieve Alyea agreed to execute mutual and reciprocal wills. Furthermore, it is plain that in the absence of Jane's and Martin's testimony, no reasonable factfinder could find, by clear and convincing evidence,[37] that Louis and Genevieve agreed to execute mutual and reciprocal wills. Louis may have wished that his wife had left more of her estate to his children, and plaintiffs may think it unfair that she did not, but the law does not require a spouse to follow her husband's wishes unless she has contractually obligated herself to do so. On the current record, plaintiffs cannot show by clear and convincing evidence that Genevieve and Louis Alyea agreed to execute mutual and reciprocal

---

agreement to execute mutual and reciprocal wills. First, only Jane and Martin, who are adverse and interested parties, can testify to this conversation, and their testimony in this regard is not otherwise corroborated. Second, even assuming the testimony does not require corroboration, Genevieve's statement reflects her present intent to bequeath a large portion of her estate to Janet Watts and to Jane, but it does not reflect the existence of an oral agreement with her husband to execute mutual and reciprocal wills. In fact, assuming the conversation transpired as plaintiffs recall, Genevieve believed she was free to change her will. While Genevieve's belief in this respect does not negate the existence of the alleged oral agreement, it likewise offers no support for the existence of the agreement.

**35.** Similarly, evidence that the estate was substantially the same at Genevieve's death as it was at Louis's death does not corroborate the existence of an agreement that Genevieve would execute a will disposing of the estate as Louis Alyea may have wished.

**36.** Plaintiffs only seek equitable relief, and for that reason they are not entitled to a jury trial. *See Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Nonetheless, plaintiffs have requested that an advisory jury be empaneled to resolve the factual disputes. *See* Rule 39(c), Fed.R.Civ.P. The disposition reflected in this Memorandum Opinion renders this issue moot.

**37.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he determination of whether a given factual dispute requires submission to a jury [or factfinder] must be guided by the substantive evidentiary standards that apply to the case.").

wills, and for that reason summary judgment must be entered in defendants' favor.

An appropriate Order will enter.