VERMONT SUPERIOR COURT
Windsor Unit
12 The Green
Woodstock VT  05091
802-457-2121
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 21-CV-00327



Susan McHugo Inouye
     Plaintiff

v.

Estate of Patricia Bixby McHugo,
Gregory McHugo, and Nancy Patricia McHugo
     Defendants

<u>Findings of Fact and Conclusions of Law</u>

John McHugo and Patricia Bixby McHugo were married and had three children, and they later divorced, though they remained close. In 1997, they made mutual wills that provided for each other and for each of the three children. In 2006, Patricia made a different will that provided for two of the three children, but which expressly disinherited her daughter, plaintiff Susan McHugo Inouye. John knew about this, but did nothing to change his existing estate plan. He thereafter died in 2010, and Patricia died in 2016. Plaintiff subsequently initiated unsuccessful litigation in both federal and state courts in Arizona and Vermont, the effect of which was that Patricia's 2006 will was allowed. See *In re Estate of McHugo*, 2020 VT 59, ¶¶ 9–10, 212 Vt. 519. In this case, plaintiff claims that her mother's 2006 will was a breach of the mutual will that her parents made in 1997. Plaintiff seeks an inheritance in accordance with the terms of the mutual will. Plaintiff additionally seeks remedies with respect to a number of property transfers made during her mother's lifetime.

A merits hearing was held on March 11th and 12th, 2024. Plaintiff Susan McHugo Inouye was present and represented by Attys. Henry and Debeaupuis. Defendants Gregory McHugo and Nancy McHugo were present and represented by Attys. Heins and Sherman.  Defendant Estate of Patricia Bixby McHugo was represented by Atty. Barnard. The following factual findings were established by a preponderance of the credible evidence presented at the hearing.

As mentioned, John McHugo and Patricia Bixby Hugo were married, and they had three children named Gregory, Nancy, and Susan, and they divorced in 1978. John expressed his end-of-life wishes in a series of letters written during the 1990s, which were admitted into evidence. He wrote on multiple occasions that he distrusted lawyers and probate proceedings, that he did not want his property to become subject to estate taxes, and that he wished for all of his property to pass through joint tenancies with rights of survivorship rather than through what he referred to as "the probate gyrations." He also wrote that he wanted for the three children to share equally in the inheritance after both he and Patricia passed away.

John effectuated these wishes by titling most of his real property and bank accounts in his own name and Patricia's name as joint tenants with rights of survivorship. In 1997, John and Patricia also entered into "mutual wills" that made provisions for each other and for the children. Both of their wills explained that their will was "executed in consideration of a mutual will simultaneously executed" by the other, and both wills explained that the parties had "agreed not to revoke or alter these wills except with the mutual consent of both." Plaintiff's Exhibit #6; Plaintiff's Exhibit #7. Both wills established a testamentary trust upon the death of the first ex-spouse for the benefit of the survivor, to be funded with "the residue" of the deceased spouse's estate, with the survivor entitled to "all of the net income" of the trust as well as "so much of the principal" as the trustee determined to be necessary for the health, maintenance, and support of the surviving spouse. Both wills also provided, upon the death of the surviving spouse, for the bequest to each of the three children of "any remaining residuary assets." Plaintiff's Exhibit #6; Plaintiff's Exhibit #7.

By 2006, the relationship between Patricia and Susan had become strained, and Patricia decided to make a new will. In her new will, Patricia made a few specific bequests for Susan's children, but otherwise she disinherited Susan. Patricia left her property instead to be shared equally by Gregory and Nancy. Defendant's Exhibit #JJ.

John was made aware of Patricia's intentions on at least two separate occasions. First, Gregory discussed the situation with his father in 2006, and during those conversations, John expressed at a minimum that he was on notice of Patricia's intentions. See Defendant's Exhibit #HH 118:2–7; Defendant's Exhibit #PP (explaining that, from Gregory's point of view, his father "consented with Mom's wish to create a new will," though the court admitted this letter for the non-hearsay purpose of showing that John was aware of Patricia's wish to create a new will, rather than for the truth of whether he consented to her wish). Second, Susan discussed the situation with her father at some point prior to July 14th, 2007, and during that conversation, her father expressed awareness of the circumstances and "apologized." See Defendant's Exhibit #A (which was also described by Susan in her testimony).

After being made aware of Patricia's intentions, John did not take any steps to change his own estate plan. He did not amend his will. He did not amend the manner in which any of his property was titled. He did not add the children's names to any of the accounts. He did not confront Patricia or otherwise take any steps to enforce the mutual will. He then passed away in 2010. All of his property was jointly titled, and so a probate estate was never opened. His will was never probated, and no property passed under the will.

Patricia then passed away in 2016, and her 2006 will was probated. See *Estate of McHugo*, 2020 VT 59, ¶¶ 9–10.

Plaintiff now contends that Patricia's 2006 will was a breach of the 1997 mutual will, and she seeks to recover a one-third inheritance of her parents' property according to the terms of the 1997 will. She also contends that her mother made various property transfers during her lifetime that amounted to breaches of the 1997 mutual will, and she seeks remedies with respect to those property transfers, too.

A "mutual will" is one in which two or more testators promise to make testamentary dispositions in favor of each other, and also in favor of agreed-upon beneficiaries. *Estate of McHugo*, 2020 VT 59, ¶ 12; *Kuhn v. Kuhn*, 281 N.W.2d 230, 233 (N.D. 1979). A "mutual will" is ambulatory and revocable during each testator's lifetime, but the contract to make a mutual will becomes irrevocable and enforceable upon the death of one of the testators. *Stephens v. Caruthers*, 97 F.Supp.2d 698, 703–04 (E.D. Va. 2000); *Kuhn*, 281 N.W.2d at 233; *Duhme v. Duhme*, 260 N.W.2d 415, 419 (Iowa 1977). The enforceable aspect of the promise is rooted in theories of detrimental reliance and estoppel. *Matter of Estate of Cohen*, 629 N.E.2d 1356, 1359 (N.Y. 1994); *Duhme*, 260 N.W.2d at 419–20; see generally Croucher, *Mutual Wills: Contemporary Reflections on an Old Doctrine*, 29 Melbourne Univ. L. Rev. 390 (2005) (explaining the English common-law and French civil-law origins of the concepts and doctrinal elements).

A significant character of contracts to make mutual wills is that they are not irrevocable until the death of one of the testators. Even in situations where two testators agree to make mutual wills, they are free to change their minds while both of them are still alive, so long as they provide the other testator with notice of their changed intentions. *Duhme*, 260 N.W.2d at 419–20; *Matter of Estate of Edington*, 489 N.E.2d 612, 614–15 (Ind. Ct. App. 1986); 79 Am. Jur. 2d Wills § 675; Bogert's Law of Trusts and Trustees § 499.1. The idea is that providing the other party with notice of the testator's changed intentions affords the other party "an opportunity to make a new will," or in other words, to avoid detrimental reliance upon the original agreement. *Estate of Edington*, 489 N.E.2d at 614–15; *Duhme*, 260 N.W.2d at 419. It is only when one of the testators dies without any notice of the other's intention to change their will that an enforceable detrimental reliance attaches; the surviving testator is then estopped from revoking their will or otherwise disposing of property during their lifetime in such a manner as to defeat the purposes of the contract. *Stephens*, F.Supp.2d at 704; *Duhme*, 260 N.W.2d at 419; Cohen, 629 N.E.2d at 1359.

In this case, defendants proved by a preponderance of the evidence that John had notice of Patricia's intention to make a new will. Gregory and Susan both discussed this fact with their father, and he expressed to both of them that he was aware of this and that he understood that Patricia intended to disinherit Susan. He expressed this to Gregory in words that Gregory interpreted as conveying his consent, and he expressed this to Susan by acknowledging the situation and apologizing for the circumstances. In other words, defendants proved by a preponderance of the evidence that John had notice of Patricia's intention to renounce their existing mutual will. See *Duhme*, 260 N.W.2d at 419–20 (explaining that actual notice of the execution of a contrary will is not necessary, and that "[a]ll that is required is notice to the other party of the testator's intention to revoke the will during the lifetime of both"). Additionally, defendants proved by a preponderance of the evidence that John had both the opportunity to amend his own estate plan in response and the capacity to do so. As such, the court concludes that there was no detrimental reliance in this case, and therefore that the contract to make a mutual will did not become enforceable. Patricia was not estopped from making a new will during the lifetime of both testators.

Plaintiff argues that the notice rules are not effective in this case because her parents agreed "not to revoke or alter" their mutual wills "except with the mutual consent of both." In other words, plaintiff argues that her parents contracted for a standard of mutual consent, rather than a standard of notice. Although the argument makes sense from a contractual perspective, the argument does not align with the equitable principles of detrimental reliance and estoppel that justify enforcement of

mutual wills. As an illustration, consider what would have happened in the event that John had notice of Patricia's intentions in 2006 but did not consent to them, and sought judicial enforcement then of the contract to make a mutual will: he would have lost that effort, because he was still alive, and because there was no detrimental reliance. He still had the opportunity to amend his estate plan in whatever manner he wished, regardless of whether he consented to his ex-spouse's change of heart.* His remedy would have been to take responsibility for his own estate plan, rather than to control the estate plan of his ex-spouse.

A second consideration supporting a rule of notice, rather than a rule of mutual consent, is evidentiary. In a case involving a claim for breach of a mutual will, both of the testators will usually have died, and the claim will be brought by an intended beneficiary. Evidence that one of the testators was on notice of the other's intentions is not hearsay, and is easily admissible under a well-established doctrine, e.g., 30B Wright & Miller, Federal Practice and Procedure: Evid. § 6723. But evidence regarding whether one of the testators consented to the other's wishes requires the surviving parties to cobble together half-remembered conversational snippets from the distant past (here, eighteen years ago), and to strategize about how those evidentiary remnants might be admissible under some hearsay exception. In this case, the evidence regarding notice came in easily, but the evidence about consent was offered in strained forms that exceeded the parameters of the various hearsay exceptions under which the evidence was offered. An example was that defendant offered testimony from the now-retired attorney who prepared Patricia's 2006 will, to the effect that Patricia told him in 2006 that she had spoken with John about the revocation of their mutual will and that he had consented to their plan. This testimony was not admitted, but it was exactly what one might expect in a lawsuit where the material fact is whether one testator agreed with the other's plan. In the court's view, it would not be fair for the substantive standard of proof to be formulated in such a way that cases are determined by whether one party manages to secure the evidentiary admission of in-court testimony from a retired attorney about an out-of-court conversation that the attorney had with a now-deceased client about a different out-of-court conversation that the now-deceased client had with her now-deceased ex-spouse. It is better, in the court's view, to apply a rule of notice (which is deeply rooted in the doctrinal foundations of mutual wills, and which is tethered to the detrimental-reliance and estoppel principles that justify relief, and for which evidence can be readily admitted under a well-established evidentiary doctrine) than to entertain a contractual standard of mutual consent (which lacks any doctrinal roots or equitable value, and which involves potential dynamics of power and control) and to compensate for the contractual standard by inviting the presentation of evidence at the outer boundaries of evidentiary reliability.

---

\* A contrary outcome might have occurred if the evidence showed that John had detrimentally relied upon the mutual wills in some other way, such as by titling the properties in both his name and his ex-spouse's name in reliance upon the mutual wills. However, the evidence presented in this case did not establish that proposition to be true. On the contrary, the evidence, including the series of letters written by John during the 1990s, established that the real properties and accounts were titled jointly long before the mutual wills were executed, pursuant to John's independent intention of ensuring that his property passed outside of "the probate gyrations."

Plaintiff also argues that a written consent was required. It may be that a written consent would have provided incontrovertible evidence. Yet the absence of a written consent is not material, because it is doubtful that John would have prevailed on a lawsuit, during his lifetime, in which he contended that his ex-spouse could not be released from the promise set forth in the contract to make mutual wills unless he expressed his consent in writing (even if he consented verbally). As before, his remedy in that circumstance would have been to revise his own estate plan, rather than to control the estate plan of his ex-spouse. Additionally, to the extent that plaintiff has argued that the absence of a written consent reflects the absence of consent, the evidence did not support that inference: the evidence instead established that the absence of a written consent reflected the view of the attorney who prepared Patricia's 2006 will that it was not necessary to obtain a written consent. In other words, the evidence established only that there was not a written consent. No other proposition material to the outcome of the case was thereby proven.

Finally, and perhaps most importantly, even if the standard requires a finding of mutual consent, the court specifically finds that defendants established by a preponderance of the evidence that (1) John had notice of Patricia's plan to create a new will in 2006 and that (2) he consented to it. Plaintiff herself testified that she told her father that mother planned to disinherit her, and that her father acknowledged this and "apologized." Notably, he did not express surprise. He did not say that the disinheritance would be ineffective. He did not say that Patricia was prohibited by contract from doing any such thing. He did not say that he would speak to Patricia and sort it out. Nor did he take any steps thereafter to amend his own estate plan. He did not amend his will. He did not amend the manner in which his properties and accounts were titled. He did not add Susan's name to any of his accounts. Instead, he acknowledged what was happening, and he apologized to Susan, and he chose to take no further actions regarding the issue. In this course of events, the court finds awareness and acceptance: in other words, consent.

In reaching this conclusion, it is clear enough that John never wanted Susan to be disinherited, but he also wanted to avoid probate and lawyers to the maximum extent possible. He wanted for all of his properties to pass through joint tenancies with rights of survivorship rather than through probate. He could have added the three children to these titles, but he did not do this, even after learning of his ex-spouse's intentions. In the end, it is his actions which must be given effect.

\* \* \*

Based upon these findings and conclusions, the court's orders are as follows. First, immediately prior to trial, plaintiff filed a second amended complaint, along with a motion seeking permission for the amendment. Generally, such amendments are permitted in order to ensure the maximum opportunity for each claim to be decided on their merits rather than upon procedural technicalities. *Prive v. Vermont Asbestos Group*, 2010 VT 2, ¶ 12, 187 Vt. 280; *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 4, 184 Vt. 1. Here, the second amended complaint clarified only the mechanisms through which relief in the case would be sought, and did not amend the substantive claims. For this reason, plaintiff's motion to amend the complaint (Motion #13) is granted.

Plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with expected inheritance, and unjust enrichment are all controlled by the court's conclusion that the contract never became enforceable, either because John had notice of Patricia's intentions, or because he consented to her plan. Likewise, because there is no predicate finding of wrongful conduct, there is no basis to support the imposition of constructive trusts. For these reasons, final judgment is entered in favor of defendants, and the case is closed. A separate final judgment order shall issue.

Electronically signed on Monday, May 13, 2024 pursuant to V.R.E.F. 9(d).

H. Dickson Corbett
Superior Court Judge

Alison M. Johannensen
Assistant Judge

David Singer
Assistant Judge

Vermont Superior Court
Filed 05/13/24
Windsor Unit